# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

MARCI A. COLLINS,

       **Plaintiff,**

    *vs.*

CAROLYN W. COLVIN, **Commissioner of Social Security,**

       **Defendant.**

**CAUSE NO.  1:14-cv-1765-DKL-JMS**

## ENTRY

In April 2011, Plaintiff Marci Collins applied for disability-insurance benefits and a declaration of a period of disability under the Social Security Act for a disability that she claimed started in December, 2005.  She asserted that she is disabled due to depression, Parkinson's disease, and tremors.  (R. 189.)  The defendant Commissioner of Social Security denied her application and Ms. Collins sues for judicial review of that denial.

## Standards

Judicial review of the Commissioner's factual findings is deferential:  courts must affirm if her findings are supported by substantial evidence in the record.  42 U.S.C. 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence.  *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).  If the evidence is sufficient for a reasonable person to conclude that it adequately supports

the Commissioner's decision, then it is substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004). This limited scope of judicial review derives from the principle that Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). *Carradine*, 360 F.3d at 758. While review of the Commissioner's factual findings is deferential, review of her legal conclusions is *de novo*. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. ▪ 416.905(a). A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). 20 C.F.R. §§ 404.1505, 404.1566, 416.905, and 416.966. The combined effect of all of an applicant's impairments shall be considered throughout the disability determination process. 42 U.S.C. ▪§ 423(d)(2)(B) and 1382c(a)(3)(G). 20 C.F.R. §§ 404.1523 and 416.923.

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. If disability status can be determined at any step in the sequence, an application will not be reviewed further. At the first step, if the applicant is currently engaged in substantial gainful activity, then he is not disabled. At the second step, if the applicant's impairments are not severe, then he is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." Third, if the applicant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, Part A, then the applicant is deemed disabled. The Listing of Impairments are medical conditions defined by criteria that the Social Security Administration has pre-determined are disabling. 20 C.F.R. ▪ 404.1525. If the applicant's impairments do not satisfy the criteria of a listing, then her residual functional capacity

("RFC") will be determined for the purposes of the next two steps.  RFC is an applicant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations and is categorized as sedentary, light, medium, or heavy, together with any additional non-exertional restrictions.  At the fourth step, if the applicant has the RFC to perform his past relevant work, then he is not disabled.  Fifth, considering the applicant's age, work experience, and education (which are not considered at step four), and his RFC, the Commissioner determines if he can perform any other work that exists in significant numbers in the national economy.  42 U.S.C. ▪ 416.920(a)

The burden rests on the applicant to prove satisfaction of steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  If an applicant has only exertional limitations that allow her to perform the full range of work at her assigned RFC level, then the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"),  may be used at step five to arrive at a disability determination.  The grids are tables that correlate an applicant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled.  If an applicant has non-exertional limitations or exertional limitations that limit the full range of employment opportunities at his assigned work level, then the grids may not be used to determine disability at that level.  Instead, a

vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics. *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993). The grids result, however, may be used as an advisory guideline in such cases.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist. If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts. If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1] An applicant who is dissatisfied with the decision of the ALJ may request the SSA's Appeals Council to review the decision. If the Appeals Council either affirms or declines to review the decision, then the applicant may file an action in district court for judicial review. 42 U.S.C. ▪ 405(g). If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

---

[1] By agreement with the Social Security Administration, initial and reconsideration reviews in Indiana are performed by an agency of state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration. 20 C.F.R. Part 404, Subpart Q (▪ 404.1601, *et seq*.). Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal Social Security Administration.

**Background**

Ms. Collins' application was denied on initial and reconsideration reviews.  (R. 78, 79, 80-83, 85-87.)  She had a hearing before an ALJ in June 2012, during which she and a vocational expert testified.  (R. 30-77.)  She was represented by present counsel during the hearing.  In May 2013, the ALJ denied Ms. Collins' application.  In August 2014, the Appeals Council denied Ms. Collins' request for review, which rendered the ALJ's decision the final decision of the Commissioner on Ms. Collins' claim for benefits and the one that the Court reviews.

Initially, the ALJ found that Ms. Collins last met the insured-status requirements for disability-insurance benefits on March 31, 2008.  Thus, in order to qualify for disability benefits, she must have become disabled between her alleged onset date, December 30, 2005, and her date last insured ("DLI"), March 31, 2008.  In her application papers, Ms. Collins alleged that she stopped work, as an attorney, on November 1, 2005, when she delivered her son.  (R. 189.)  She stated that she did not return to work after the birth because she developed depression and Parkinson's disease, which became disabling on December 30, 2005.  (*Id.*)

At step one of the sequential evaluation process, the ALJ found that Ms. Collins had not engaged in substantial gainful activity since her alleged onset date.

At step two, the ALJ found that Ms. Collins had the following severe impairments as of her DLI:  **(1)** right-wrist ganglion of variable presence; **(2)** tremor of the right hand, described as a benign tremor or a fine tremor and later determined to be Parkinson's

disease; and **(3)** neurological dysfunction, described as reduced reflexes in her legs and absent knee jerks.  The ALJ found that Ms. Collins' pregnancy; malignant melanoma; mental impairments (described as depression or post-partum depression, and anxiety); mild endocrine dysfunction (described as autoimmune thyroiditis); and respiratory dysfunction (described as cough/congestion, acute bronchitis, tonsil hypertrophy with tonsillectomy) were not severe impairments and did not cause chronic, work-related limitations.  (R. 14.)  She found that Ms. Collins' alleged chronic fatigue syndrome and sleep apnea were not medically determined.  (R. 16.)  The ALJ found that the post-DLI evidence showed hepatic cysts and bilateral tremors, but that they were not medically determined during the relevant period.  (R. 16-17.)

At step three, the ALJ found that Ms. Collins' impairments, severe and non-severe, singly and in combination, did not meet or medically equal any of the conditions in the listing of impairments.  She specifically evaluated listing 1.02, major dysfunction of a joint, and listing 11.06, Parkinsonian syndrome.

For the purposes of steps four and five, the ALJ determined that, before her DLI, Ms. Collins had the residual functional capacity for sedentary work with the following additional capacities and restrictions.  Posturally, she had the ability to frequently balance and occasionally occasionally stoop, kneel, crouch, and climb stairs and ramps.  With regard to manipulation and sensation, she had the ability to frequently reach, handle, and finger, and had no limitations in feeling.  Mentally, she could understand, remember, and carry out multiple-step, but not complex, tasks; she could appropriately interact with

supervisors, co-workers, and the general public; she could identify and avoid normal workplace hazards; and she could adapt to routine changes in the workplace.

At step four, the ALJ found that this RFC prevented Ms. Collins from performing her past relevant work as an attorney and administrative clerk.  Finally, at step five, the ALJ found, based on the vocational expert's testimony, that a significant number of jobs existed in the national economy that a person with Ms. Collins' RFC, education, age, and skills could perform and, therefore, she was not disabled before her date last insured.

## Discussion

Ms. Collins argues three errors in the ALJ's decision.

**1.  Absence of medical opinion on listings medical equivalence.**  Ms. Collins argues that the ALJ's decision is not supported by substantial evidence and is contrary to law because the record contains no expert medical opinion on the medical equivalence of her impairments to listing 11.06, Parkinsonian syndrome.

A claimant's impairment, or impairments, are medically equivalent to, and thus satisfy, a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 404.1526(a).  Equivalence is a medical judgment and requires expert medical opinion.  *See* 20 C.F.R. § 404.1526(c); S.S.R. 96-6p, *Medical Equivalence to an Impairment in the Listing of Impairments* ("[L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the

8

Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."); *Minnick v. Colvin*, 775 F.3d 929, 935-36 (7th Cir. 2015) (citing *Barnett*, *infra*); *Barnett v. Barnhart*, 381 F.3d 664, 670-71 (7th Cir. 2004) (quoting earlier version of 20 C.F.R. § 404.1526).

Although the opinions of state-agency medical and psychological reviewers rendered on initial and reconsideration reviews can supply the required expert medical-equivalence opinion, S.S.R. 96-6p, Ms. Collins argues that the state-agency reviewers' determinations in this case do not so so because the reviewers specifically found that "there is insufficient evidence to determine the extent to which the [claimant] was limited by the condition of [P]arkinson[']s, tremors, and other issues alleged."   (R. 329 (*Case Analysis* on initial review), 331 (*Case Analysis* on reconsideration review, affirming initial *Case Analysis*).)   Ms. Collins reads too much into these *Case Analysis* forms.   The *Disability Determination and Transmittal* forms on which the state-agency physicians recorded their initial and reconsideration decisions show that they found Ms. Collin's not disabled, which necessarily includes their step-three determinations that her impairments do not satisfy — either by meeting or medically equaling — any listing.  (R. 78, 79.) The *Explanation of Determination* notices sent to Ms. Collins after each determination declared that "Evidence available is not sufficient to establish a disabling condition."  (R. 83, 87.)  Those are definite findings and opinions that the evidence fails to establish medical equivalence to a listing.  The *Explanation of Determination* notices also stated:

> We could not reach any conclusion about the limitations caused by your condition.  Any opinion offered by a treating or examining source was given serious consideration.  However, due to the lack of required medical findings, we were unable to make a determination.

*     *     *

> The medical evidence shows that additional information needs to be obtained in order to accurately assess the severity of your condition.  *  *  *
>
> To assess the severity of your condition, clinical and laboratory findings are needed to establish a disabling condition.  Because this information could not be obtained, a disabling condition cannot be established on any date through 03/31/2008, the date the earnings requirement was last met.

(R. 83 (initial determination).)  See (R. 87 (reconsideration decision).)  Due to the lack of evidence, the state-agency consulting physicians were unable to determine the actual degree of Ms. Collins' limitations or the severity of her impairments, but the lack of evidence also meant that, in their opinion, the evidence did not show that her impairments satisfied any listing.  Thus, the record contained expert medical opinion on the issue of medical equivalence based on the record evidence.

However, the question remains whether these opinions were sufficient because Ms. Collins also argues, just barely, that the state-agency consultants' opinions "cannot constitute an opinion on the issue of equivalency regarding evidence largely submitted after these statements were offered," and she cites medical evidence that was generated during the period before her insured status expired — Exhibits 13F (a mix of pre- and post-expiration evidence), 16F (same), 18F (same), and 21F (only pre-expiration evidence) — and medical evidence that was generated after her date last insured — Exhibits 9F and 10F.  (*Plaintiff's Brief* [doc. 12] (*"Brief"*), at 22, ¶ 2.)  The ALJ's failure to obtain medical-expert opinion on the evidence that was generated after her date last insured ("DLI") is the subject of a separate argument by Ms. Collins, discussed below.  However, it is clear that much medical evidence that was generated during the relevant period entered the record after the state-agency reviewers rendered their initial and reconsideration determinations, namely Exhibits 13F, 16F, 18F, and 20F through 24F.  This evidence was entered

into the record between February, 2012, (R. 374), and June, 2012, (R. 441, 532), long after the initial (June, 2011) and reconsideration (August 22, 2011) medical determinations.

The *Explanation of Determination* notices that the state-agency reviewers completed list the medical records that they reviewed for their determinations, (R. 83, 87), and that evidence apparently consisted of only Exhibits 1F through 3F, which were submitted in May, 2011.[2]  Thus, there is a wealth of evidence, generated during the relevant period (between alleged onset date and DLI) on which no expert medical judgment has been rendered regarding medical equivalence. Neither Ms. Collins nor the Commissioner argued the effect of this later-submitted evidence on the equivalence determination and the Court will not examine it *sua sponte*.  While the Court agrees with the Commissioner that it is Ms. Collins' burden to prove disability through step four, it is also well-established that medical equivalence is a medical judgment and that the Commissioner is required to receive and consider expert medical opinion thereon.  That opinion is missing in this case.  The solution was simple and probably would not have required much time: the Commissioner could have simply requested that the state-agency reviewers render supplementary opinions based on a review of the entire record or she could have obtained an outside consultant's opinion, on interrogatories, an alternative that she acknowledged, at the hearing, was available to her, (R. 37-38, 76).

Because the ALJ's step-three determination that Ms. Collins' impairments, severe and non-severe, singly or in combination, do not medically equal listing 11.06 is not based on an expert

---

[2] The initial decision's *Explanation of Determination* also lists a report from G. Joseph Herr, M.D., that was received on May 24, 2011, (R. 83), but the Court was unable to identify this report in the Record. The Court Transcript Index [Doc. 10-1, p. 2] shows records received from Dr. Herr as Exhibit 9F, but those records were received on November 30, 2011, (R. 332), after the administrative reviews were performed.

medical judgment in the record, it is not supported by substantial evidence and is contrary to law. Because the Commissioner has not shown that the error is harmless, Ms. Collins' claim will be remanded for the acquisition of such expert medical opinion and the Commissioner's consideration of it and reconsideration of Ms. Collins' claim.

**2. Various Parkinson's-disease findings.** Ms. Collins argues that some of the ALJ's findings supporting her rejection of Ms. Collins' allegations of disabling symptoms of Parkinson's disease are not supported by substantial evidence and, thus, that the ALJ failed to build a logical bridge from the evidence to her finding of no disability.

**a. Emphasizing CT scan and MRI.** Ms. Collins argues that "[d]espite noting that claimant was 'unable to read and speak normally' in 2001 and exhibited a fine tremor on the right, high reflexes at one point, and 'markedly reduced reflex leg and ankle reflexes' at another point (both are evidence of neurological dysfunction) in 2006, she emphasized that a CT scan and MRI were entirely normal. [R. 19, 21]." (*Brief*, at 24.) She argues that the ALJ's emphasis on the normal CT scan and MRI was error because Parkinson's disease is not diagnosed by a CT scan or MRI. The ALJ's mentions of the CT scan and the MRI appear in her discussion of the "evidence relating to Ms. Collins' right hand tremor . . . ." (R. 19, ¶ 5.) While describing several items of that evidence — including complaints and medical tests, examinations, and treatments — the ALJ mentioned the normal results of a CT scan and an MRI. The ALJ's brief description of these test results includes no indication that she rejected either Ms. Collins' diagnosis of Parkinson's disease — which was not made until about two and one-half years after her DLI — or the possibility that Ms. Collins' tremor was an early manifestation of Parkinson's disease. As medical providers were attempting to assess Ms. Collins' right-hand tremor and its etiology, they ordered tests including the CT scan and MRI. That those tests had normal results was significant as eliminating possible

causes of her tremor, and the ALJ was warranted in mentioning the fact.  The ALJ found that "[t]he evidence relating to Ms. Collins' neurological dysfunction, including reduced reflexes and absent knee jerks, demonstrates lesser limitations than alleged," (R. 21), and the absence of causative and limiting conditions that would have been shown by a CT scan, MRI, or EEG was only one part of the ALJ's analysis.  The ALJ found that Ms. Collins had the severe impairment of tremors, which were later determined to be due to Parkinson's disease.  (R. 14.)  Ms. Collins has not shown error.

     **b.  Conservative care.**  Similarly, Ms. Collins argues that the ALJ erred when she "emphasized that the claimant received 'conservative care'" because the primary treatment methods for Parkinson's disease are conservative.  (*Brief*, at 24-25.)  Again, when discussing the evidence regarding Ms. Collins' tremors during the relevant period, the ALJ noted that Ms. Collins' treatment providers prescribed only conservative care for her, primarily exercise.  (R. 19, 21.)  Ms. Collins does not contend that the ALJ was wrong and that she was, in fact, administered a rigorous treatment regimen.  Ms. Collins did not receive a medical diagnosis of Parkinson's disease until about two and one-half years after her DLI, yet the ALJ, at step two, found that she had the condition "[t]hrough the date last insured."  (R. 14, ¶ 4.)  Thus, when the ALJ discussed pre-DLI evidence, she was evaluating Ms. Collins' functional limitations that she had at the time ─ not whether she had Parkinson's disease.  In addition, because Ms. Collins' providers did not consider her to have Parkinson's disease at the time, their prescriptions of conservative care are irrelevant to the presence of Parkinson's disease.  Finally, there is no indication that the ALJ considered the conservative nature of Ms. Collins' prescribed treatment to be dispositive on the issue of the severity of her functional limitations at the time; she gave greater weight to the absence of, or mild signs or symptoms of, functional limitations such as impaired reflexes, knee jerks,

ambulation, strength, sensation, vibratory thresholds, and fine motor skills.  Ms. Collins has not shown error.

**c.  Improvement in 2009.**  Ms. Collins argues that the ALJ's statement that "evidence from 2009 demonstrated 'the impairment improved to a degree rather than worsened'" is contradicted by the record and the ALJ's other findings.  (*Brief*, at 25.)  Ms. Collins has exaggerated the ALJ's statement and thus argues against a strawman.  The ALJ wrote that "[i]n early 2009 [after the DLI], the claimant demonstrated full strength, intact sensation, and normal walking despite tremors.  This evidence demonstrates the claimant's walking, standing, strength, and sensation were all normal even well after the date last insured.  *  *  *  The claimant retained the ability to walk, as well as full strength throughout 2009.  Her tremors continued."  (R. 20 (citations omitted).)  The ALJ later wrote:  "The claimant's strength, sensation, vibratory thresholds, and reflexes all tested as normal in early 2009, evidence actually demonstrating the impairment improved to a degree rather than worsened.  These trends continued through late 2009."  (R. 21 (citations omitted).)  Ms. Collins argues that the ALJ's statement is contradicted by her complaints of increasing tremors through 2009 and her treatment providers' confirmations of the same.  (*Brief*, at 25-26.)  But she does not dispute the largely normal findings regarding her strength, sensation, walking, standing, vibratory thresholds, and reflexes during 2009 that the ALJ specifically mentioned.  The ALJ specifically noted that Ms. Collins' tremors continued; she did not state that Ms. Collins' tremors improved in 2009.  Ms. Collins has not shown error.

**d.  Headaches.**  Ms. Collins argues that the ALJ overlooked her headaches because she "never once mentioned" them "or discussed their impact on her ability to perform other work at Step Five."  (*Brief*, at 26-27.)  The Commissioner's response is that Ms. Collins failed to refer to

14

any evidence that her headaches caused disabling symptoms before her DLI, despite the burden of proof being on her.

Ms. Collins' *Brief* cites reports in the medical records of her "strong family history of vascular headaches," (*Brief*, at 5; R. 521 (2001 hospital record)); her complaints, and her treating providers' impressions, in 2006, 2008, 2009, 2010, and 2011, of chronic, daily, common, and/or intractable headaches or migraines, (*Brief*, at 6, 8, 8-9, 9, 10; R. 29 1, 388, 357, 355, 343-44, 340, 291-98), and her treating providers' prescriptions and refills of Imitrex and Nadolol for migraine headaches, (*Brief*, at 8, 8-9; R. 389, 357, 355).  During the hearing Ms. Collins' counsel argued her migraines, in combination with other impairments, as a cause of her disability (and as a reason to call a medical expert), (R. 38, 41); the ALJ questioned Ms. Collins about her migraines, (R. 56-58, 59-60); and Ms. Collins testified to experiencing "frequent, migraine type headaches" before her son was born that carried over into the relevant period, (R. 56-57), and to experiencing weekly migraines that would force her to bed and to leave work during the relevant period, (R. 57-58). Yet the ALJ's decision is devoid of any mention or evaluation of Ms. Collins' migraines.  Because her alleged migraines, for which she received medical treatment, were a significant component of her alleged disability during the relevant period, it was error for the ALJ to ignore them.

Ms. Collins's *Brief* argues the significant effects of her migraines, and the Court cannot conclude, after examining the record evidence and hearing testimony, that the ALJ's error was harmless.  Ms. Collins has shown error and she has shown that a remand is warranted on this point. On remand, the Commissioner must evaluate Ms. Collins' migraines and reconsider and articulate their effect, if any, on her eligibility for disability benefits.

**e. Ms. Collins' quitting work.**  Ms. Collins argues that the ALJ also overlooked the fact that she stopped working as an attorney on her alleged onset date in December 2005:  "Thus, the ALJ erred by overlooking that the Plaintiff 'left work as an attorney due to her symptoms' in 2005 before rejecting her allegations of an inability to work since that date.  (Dkt. 10-2 at 19)[.]  Because she ignored this corroborative evidence, the ALJ failed to build a logical bridge between all of the relevant evidence and her conclusion that Plaintiff could sustain the assessed RFC at the time of her date last insured."  (*Brief*, at 27.)  But this statement of her argument quotes and cites the ALJ's statement in her decision that "[Ms. Collins] stated that she left her work as an attorney due to her symptoms."  (R. 19.)  The ALJ also noted, several times, Ms. Collins' alleged onset date of December 30, 2005, about two months after she ceased working.  The ALJ did not overlook or ignore the fact that Ms. Collins alleged that she quit work due to her symptoms.

**3.  Medical expert review of post-DLI evidence.**  Ms. Collins argues that the ALJ erred by not obtaining an expert medical opinion on whether the post-DLI record evidence shows that her pre-DLI combination of impairments medically equaled listing 11.06.  According to Ms. Collins, because Parkinson's disease is a slowly progressing condition, it can be difficult to determine when it became disabling and that determination is a medical issue which the ALJ was not qualified to make.  In a pre-hearing motion, Ms. Collins requested a medical expert, preferably a neurologist, to testify at the hearing because of the difficulty of determining when her Parkinson's disease "met" listing 11.06, (R. 253), but the ALJ received the motion too late to summon a medical expert at the hearing, (R. 36-39).  At the hearing, Ms. Collins' counsel requested that the ALJ obtain an expert medical opinion on Ms. Collins' Parkinson's disease after the hearing because of the difficulties of determining onset when there is a remote DLI and "because there's

a significant component of forgetfulness and depression and headaches in here, and I wonder if those things combined don't equal that listing." (R. 38.) The ALJ reserved the question.

In her decision, the ALJ explained that she did not obtain a supplemental expert opinion because she found that there was sufficient evidence in the record from before, during, and after the relevant period to evaluate whether Ms. Collins was disabled at the time. (R. 11.) The ALJ noted that the pre-onset evidence provided useful background history and that the post-DLI evidence provided a view of the limitations and care to which Ms. Collins' impairments eventually led. (*Id.*) She found that there was sufficient evidence from the relevant period and that, compared to medical opinion speculating on pre-DLI capacity based on post-DLI evidence, "[t]he best source for information on the claimant's in [*sic*] the period at issue in this case is the evidence taken at that particular time." (*Id.*) She wrote that the relevant-period evidence included extensive neurological treatment records aimed specifically at Ms. Collins' tremors, neurological testing, gait evaluations, strength observations, clinical impressions, treatment plans, background on Ms. Collins' complaints and reasons for seeking care, and diagnostic studies. (*Id.*)

Ms. Collins contends that the ALJ erred when she found that "Plaintiff's slowly progressive medical condition after the date last insured did not relate to the period before the date last insured without ever consulting a physician." (*Brief*, at 29.) She quotes S.S.R. 83-20's instruction:

> How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, *must have a legitimate medical basis*. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

S.S.R. 83-20, *Precise Evidence Not Available — Need for Inferences*, ¶ 1 (emphasis added by Ms. Collins); (*Brief*, at 29).  Based on this authority, Ms. Collins argues that the ALJ was required to call on a medical expert to opine whether the post-DLI evidence supports satisfaction of listing 11.06 before the DLI.  But other parts of S.S.R. 83-20 clarify that expert medical opinion regarding disabilities caused by slowly progressive impairments is required when an onset date must be inferred due to remote alleged onset dates or dates last worked, and/or lack of contemporary medical evidence:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.  Determining the proper onset date is particular difficult, when for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available.  In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.
>
> \*         \*         \*
>
> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date that the claimant stopped working.  [Here follows the passage quoted by Ms. Collins, above.]

*Id.*, *Onset in Disabilities of Nontraumatic Origin*, ¶ 3; *Precise Evidence Not Available — Need for Inferences*, ¶ 1.

The ALJ explained that she denied Ms. Collins' request to call a medical expert because she found that the record contained sufficient contemporary medical and other evidence generated during the relevant period to determine whether Ms. Collins' Parkinson's disease and other impairments caused her to become disabled during that period.  In other words, the ALJ found that it was not necessary to *infer* an onset date

from evidence generated after the DLI; thus, there was no need for expert medical opinion on the usual progression of Parkinson's disease and whether the post-DLI medical evidence supported an onset date before the DLI. (R. 11.) The ALJ found that whether the functional limitations caused by Ms. Collins' impairments rendered her disabled before her DLI could be determined better from the pre-DLI evidence.

Ms. Collins has not shown that the ALJ's decision is not supported by substantial evidence. She has not shown that the pre-DLI evidence cited by the ALJ was insufficient to determine whether her Parkinson's disease and other impairments caused disabling functional limitations or satisfied listing 11.06 before the DLI. In addition, Ms. Collins did not submit any opinions from her medical providers that her post-DLI signs, symptoms, or laboratory or diagnostic results proved that she had disabling functional limitations before her DLI. As Ms. Collins notes in her *Brief*, the ALJ specifically stated that post-DLI medical evidence did not relate then-current functional limitations back to the pre-DLI relevant period. Ms. Collins mistakenly interprets these statements as the ALJ making medical judgments about the meaning of the evidence when, in fact, the ALJ simply noted that the medical reports themselves did not apply their findings and opinions of functional limitations back to the relevant period. The ALJ simply noted the absence of any post-DLI medical evidence opining that Ms. Collins must have had disabling limitations, or satisfied listing 11.06, before her DLI.

Ms. Collins had the burden to prove disability. If any of her treating sources could have provided expert medical opinion that supported pre-DLI disability based on post-

DLI evidence, then she should have obtained and submitted such opinions. Ms. Collins does not now, on the present review, offer any reason for not presenting such opinions to the ALJ or any reason to believe it likely or possible that her post-DLI evidence indicates pre-DLI satisfaction of listing 11.06, contradicts the pre-DLI evidence relied on by the ALJ, or contradicts the ALJ's findings thereon.[3]

Ms. Collins has not shown that the ALJ's determination not to obtain a post-hearing medical opinion on the post-DLI evidence was not supported by substantial evidence or was legally erroneous.[4]

## Conclusion

For the reasons explained above, the Commissioner's denial of Ms. Collins' claim for disability benefits will be reversed and remanded for reconsideration. On remand, the Commissioner must obtain an updated expert medical opinion on medical

---

[3] While Ms. Collins could have requested such opinions from her post-DLI treating sources for purposes of the present review, the question would arise why she did not obtain and submit those opinions earlier, during the administrative proceedings.

[4] The Court notes that, if the ALJ found that expert medical opinion relating post-DLI evidence of a progressive impairment's limiting effects to pre-DLI disability is improper because it would be "speculative," then she would be wrong. S.S.R. 83-20 specifically approves, and finds necessary, such opinion evidence in appropriate cases. However, the Court does not construe the ALJ to have made such a finding. While perhaps not as clearly expressed as it could have been, the Court finds that the ALJ's statement meant only that evidence generated during the pre-DLI period can be better evidence of a claimant's pre-DLI functional limitations than medical opinion speculating from post-DLI evidence, if the pre-DLI evidence is sufficient and on-point.

equivalence to listing 11.06 and must evaluate Ms. Collins' migraines and reconsider and articulate their effect, if any, on her eligibility for disability benefits.

**DONE this date:**   03/17/2016

_Denise K. La Rue_

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution to all ECF-registered counsel of record _via_ ECF-generated e-mail.

21